# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

     v.

REX YANG, JR.,

        Defendant.

Case No. 15-00392-CR-W-DGK

## SENTENCING MEMORANDUM OF THE UNITED STATES

Comes now the United States of America, by and through Timothy A. Garrison, United States Attorney, and Patrick D. Daly and James Curt Bohling, Assistant United States Attorneys, and respectfully submits this Sentencing Memorandum. Upon consideration of the defendant's conduct in this case, the reasons laid out in a separate motion, and the relevant factors found under 18 U.S.C. § 3553, the Government recommends a sentence of approximately twelve months imprisonment. In support of its position, and in advance of the sentencing hearing, the Government offers the court the following background, authorities, and arguments.

In the late spring of 2013, Department of Homeland Security – Homeland Security Investigations ("HSI") special agents operating in Kansas City, Missouri, learned that a local individual, Casey Lee Ross ("Ross") was suspected of trafficking in numerous counterfeit software programs and DVDs. (Presentence Investigation Report ("PSR") ¶ 12.) HSI initiated an investigation, and soon determined that Ross was acquiring counterfeit software components from sources in China, as well as numerous digital transmissions which contained unauthorized product key codes for the activation of copyrighted computer programs developed by Microsoft Corporation ("Microsoft"). (PSR ¶ 12.) HSI special agents soon learned that Ross was acting as a supplier and intermediary between the sources in China and various "software resellers" operating

within the United States, including Jake Schwartz (hereinafter "Schwartz" or "Defendant"). (PSR ¶ 14.)

On December 16, 2015, Yang entered a plea of guilty. (Docket Entry ("Doc.") 7, 9.) He was the sixth to do so, after Casey Ross, Matthew Lockwood, Arunachalam Annamalai, Reza Davachi, and Jake Schwartz, respectively. Following his guilty plea, additional targets of this investigation who conspired with Yang, Ross, and others –David Reece and Wen Tao Liu – also pled guilty.

As noted in the correspondence submitted by U.S. Probation Officer Dana Chance on August 18, 2016, there are standing factual objections as to various paragraphs. (PSR Addendum, Doc. 20.) The parties do not dispute the agreed-upon loss.

## OVERVIEW OF SOFTWARE PIRACY

## I.    OVERVIEW OF SOFTWARE PIRACY

Over the course of this investigation and prosecution, the Government documented a wide array of software items that were possessed and trafficked by these defendants, whether in physical form (Certificates of Authenticity and other types of software packaging, and documentation, including product key cards) or digital form (product key codes sold over the Internet, and typically, e-mailed to customers). As the Government evaluated this evidence over the course of this investigation and prosecution, the charging options for each of these software items were assessed relative to each defendant in light of existing anti-piracy and anti-counterfeiting laws (and amendments over time), the evolution of the software industry, and the varying *mens rea* requirements associated with a particular charge. It is the Government's intent that this summary details an overview of these factors to provide some context to the court for this investigation and

2

the agreed-upon loss calculation in consideration of these factors.

## Overview of Anti-Piracy Laws and Enforcement

Ever since software was manufactured and developed for public purchase, software developers have had to guard against software piracy. Virtually every new version of an operating system or productivity software is beset by pirates and counterfeiters, and even sophisticated means of protecting these programs are typically broken and circumvented shortly after new methods of distribution or dissemination are introduced to the marketplace.

Historically, software piracy pertained in some way to the physical media, since physical distribution was the only legitimate means of distributing these software programs to prospective end users and customers. At one point in the not-too-distant past, passable counterfeits of physical media containing these copies of software programs (such as floppy discs, compact disc (CD) and digital video disc (DVD)) were difficult if not impossible to replicate, but advances in technology in the 1990's made it possible for individuals using a personal computer, CD burner, and high quality printer to replicate this physical media, which was the exclusive means software developers used to distribute their programs. In reaction to the rampant piracy of physical digital media, 18 U.S.C. § 2318 was amended in 1996 to specifically add computer software as well as computer software documentation and packaging to the list of works protected by that statute.[1]

When the physical media, its labels or the documentation and packaging associated with a copyrighted work is counterfeited, this conduct is typically charged under the "counterfeit labels" or "counterfeit documentation or packaging" provisions of 18 U.S.C. § 2318. If any of these

---

[1] *See* Anti-counterfeiting Consumer Protection Act of 1996, Pub. L. No. 104-153, 110 Stat. 1386 (codified as amended at 18 U.S.C. §§ 1961(1)(B), 2318, 2320(e), *et seq.* (1996)).

3

goods or services bear a counterfeit mark – such as logos or trademarks employed by Microsoft, Adobe, or Lenovo – knowingly trafficking in these items could be charged as trafficking in counterfeit goods or services pursuant to 18 U.S.C. § 2320.

### Addition of the "Illicit Labels" Provision to Anti-Counterfeiting Laws

Due to the increasing ease of creating counterfeit physical media, and related documentation and packaging, software developers began incorporating additional authentication measures – known as Certificates of Authenticity ("COA") and COA labels – to accompany the physical software they distributed to their consumers. These COAs and COA labels contained unique identifiers and technological features comparable to those found in U.S. currency, and are created to demonstrate legitimacy and authenticity that may not be possible to include in more easily-replicated



Fig. 1 – Pictured are COAs that had been pulled and harvested from personal computers. These COA labels were then placed onto sheets of wax paper and resold to suppliers separate and apart from the hardware or any physical

physical media such as CDs or DVDs. Section 2318 was amended again in 2004, to add the provision that these legitimate, authentic labels must be sold "affixed to, enclosing, or accompanying, or designed to be affixed to, enclose, or accompany" copies of copyrighted works, to include computer programs or documentation or packaging, and such illicit label is distributed or intended to be distributed without the authorization of the copyright owner.[2]

---

[2] *See* Anti-counterfeiting Amendments Act of 2004, Pub. L. 108-482, 118 Stat. 3912 (codified as amended at 18 U.S.C. § 2318, *et seq.* (2004)).

4

## Software Piracy in the Digital Age

With the expansion of high-speed broadband internet connections in the late 2000's, more companies began offering their products through digital transmission. For example, file sharing services such as Napster – which facilitated the distribution of illegal downloads – hastened the music industry's transition to offering authorized digital downloads of their products. By the end of the decade the physical music industry had all but disappeared, with music retailers such as Tower Records and Sam Goody essentially supplanted by the iTunes music store or music streaming services such as Spotify or Pandora.

The software industry soon began offering digital licenses of its software programs and digital copies of its operating systems as well. For some time, software developers such as Microsoft, Adobe, and many others had incorporated a form of digital rights management ("DRM") into the software programs contained on the physical media. This DRM was meant to prevent unauthorized redistribution of the programs contained on the physical media. An end user would not have full access to the use of these programs unless they were authenticated, or "unlocked," through the use of a product key code.

5

These product key codes were often printed onto the Certificates of Authenticity or similar formal documentation or packaging that accompanied the physical copies of the software media. Many COAs were also physically applied to computers which had copies of this computer programs (usually operating systems) preloaded onto them.



Fig. 2 - An example of use of the product key code during the Microsoft software activation process.

In the early 2010's, software developers eventually began offering these products through digital download, where there was not a physical distribution of the program at all. Rather, a prospective end-user would download a copy of a given program (such as Windows 7, Microsoft Office, or Adobe Photoshop) and separately purchase a related product key code (Microsoft) or serial number (Adobe) to authenticate said program. This authentication process would then analyze the inputted product key code or serial number against a unique algorithm or an online server to verify that it was an authentic, legitimate code or number that was authorized to be used for that specific program. Assuming this proffered code satisfied various qualifications (that the code corresponded to that intended program, had not exceeded the number of permissible



Fig. 3 - An example of a Microsoft COA, which contains the product key code for this operating software.

6

activations, etc.) the code would then permit the authentication of the loaded software program.

**"Software Slashers" Investigation**

In mid-2013, special agents with Homeland Security Investigations ("HSI") in Kansas City, Missouri, received a tip that a local individual, Casey Lee Ross, was selling numerous counterfeit versions of computer programs as well as other counterfeit media. HSI special agents learned through their investigation that in addition to trafficking in copies of counterfeit physical media (such as counterfeit Microsoft "Lenovo" Product Key Cards), Ross was obtaining and redistributing (from sources in China) a large volume of product key codes.



Fig. 4 - Overview of software piracy scheme.

Unlike the counterfeit physical products, these digital product key codes were being sent to Ross via email and other forms of digital transmission from Ross's sources in China, and

7

subsequently redistributed by Ross to various other resellers within the United States. Over time, Ross supplied these resellers with a blend of both physical and digital products. In some instances, Ross would acquire the counterfeit "Lenovo" product key cards and manually extract the product key codes from them, and then sell the extracted product keys through a digital transmission. In other instances, Ross simply shipped the "Lenovo" key cards to these resellers.

An early analysis in late 2013 of the observed product key codes that were acquired by Ross and resold to others demonstrated that they had been fraudulently obtained by harvesters in China through various means, including thefts from Microsoft's call centers. In addition, these product key codes were often separately activated numerous times over on computers in different countries across the globe, and many had exceeded their authorized numbers of activations.



Fig. 5 and 6 – Analysis conducted in the fall of 2013 shows the origination and activations of the product key codes trafficked by Ross.

During the course of the conspiracy, the software industry began to shift to the practice of engaging in digital transactions, but many of the commonly-used anti-piracy statutes (e.g., 18 U.S.C. §§ 2318 and 2320), contemplated a physical nexus for jurisdiction and venue. A good portion of these codes were obtained through a direct theft from Microsoft's call centers, and never originated on any physical media. Some of the digital codes analyzed in the course of this

investigation were created and distributed solely through digital means, and were (or would be) eventually used to authenticate a copy of a computer program on an end-user's personal computer or computing device.

This is not to say these codes were not ultimately conveyed in any material way; many of these codes were eventually placed onto the counterfeit products such as the Lenovo cards and sold by individuals such as Liu and others. However, once obtained, many resellers – such as Ross and some of those he supplied – would again extract these codes from these counterfeit physical items, selling them to other suppliers or customers via digital transaction. Software product activation codes or serial numbers that did not have an antecedent or equivalency in physical form (whether as an "illicit" COA, or if it was extracted from a genuine physical or counterfeit item) would only be chargeable under the "digital" options: access device fraud (18 U.S.C. § 1029), wire fraud (18 U.S.C. § 1343), or criminal copyright statutes (18 U.S.C. § 2319, or 17 U.S.C. §§ 506 and 1201, *et seq.*), rather than charges under §§ 2318 and 2320.

Given the multitude of both physical and digital items being sold and trafficked, and the nuance within each of these disparate categories, the Government worked closely with the affected victims (Microsoft Corporation and Adobe Systems Incorporated) to learn the practices specific to this industry to best assess the criminal charging options given the origination of these products. Subsequent to enforcement actions against these respective defendants, the Government gained context as to the various methods of acquiring these items, and the respective *mens rea* given practices within the software industry and the contentious relationship with these resellers. This extensive consultation with all parties informed the Government's approach towards its charging decisions and loss calculations, all of which is detailed below.

## Physical Distribution of Software

In determining the criminal conduct that flowed out of the **physical distribution** of these products, one threshold determination is whether the item was **counterfeit** ("appears to be genuine, but is not"[3]) or **genuine but illicit** (that is, it was trafficked separate and apart from the physical copy of the computer program it was intended to accompany).

If a prospective discreet physical product was determined to be **counterfeit**, the appropriate charges (depending on the nature of the unit, e.g. whether it was a label or documentation or packaging) would be **trafficking in counterfeit labels** (18 U.S.C. § 2318(a)(1)(A) & (b)(1)), **trafficking in counterfeit documentation or packaging** (18 U.S.C. § 2318(a)(1)(A) & (b)(6)), or **trafficking in**



**Fig. 7- An example of a counterfeit Microsoft "Lenovo" Product Key Card, which bears counterfeit marks of Microsoft and Lenovo.**

**counterfeit goods.** (18 U.S.C. § 2320(a).) These counterfeiting charging options are not mutually exclusive; for example, an item such as the Microsoft "Lenovo" Product Key Card could be charged as both a counterfeit label or documentation and packaging (under 18 U.S.C. § 2318), *and* a counterfeit good (18 U.S.C. § 2320), provided it bore a "counterfeit mark" (for example, trademarks logos for Microsoft, Adobe, or Lenovo).

If a prospective unit of prosecution was determined to be **genuine**, and found that it had been trafficked separate and apart from the copies of computer programs it was intended to (or did) accompany, and were done so without authorization of the copyright owner, the appropriate

---

[3] This succinct definition of "counterfeit" is drawn from statutory definitions for "counterfeit label" and "counterfeit documentation or packaging." *See* 18 U.S.C. § 2318(b)(1) & (6).

10

charge would be **trafficking in illicit labels** (18 U.S.C. § 2318(a)(1)(A)(ii) & (b)(4)).

In this matter, Yang pled guilty to conspiring to violating the "illicit" labels provision of 18 U.S.C. § 2318.

## Digital Distribution of Product Key Codes

As noted, much of the focus of this investigation and prosecution involved digital product key codes which were trafficked exclusively through digital means (e.g., within Excel spreadsheets, within emails, or via instant chat programs). Because of the digital provenance of these product key codes, many of them had never originated on, nor were they extracted from, a physical item, whether a COA or other documentation and packaging which accompanied this associated software program.

If a product key code or serial number was trafficked digitally, the appropriate charges (depending on the relative methods of conveyance and *mens rea* for the defendant's intent and knowledge as to their illegality), would be **access device fraud** (18 U.S.C. § 1029(a)(6)), **wire fraud** (18 U.S.C. § 1343), or **criminal copyright statutes** (18 U.S.C. § 2319, 17 U.S.C. §§ 506, *et seq.*). Unlike the aforementioned charges under 18 U.S.C. §§ 2318 or 2320, these charges usually involve a fraud component ("intent to defraud" is an element for access device or wire fraud) and/or a heightened *mens rea* (willfulness in criminal copyright statutes).

11



Fig. 8 - Charges to which each defendant pled guilty.

## Loss Calculation Per Discreet Item

As noted, this investigation and prosecution encountered a wide array of software products and components acquired and trafficked by the defendants. The software items had manufacturer's suggested retail prices ("MSRP") ranging from approximately $139 to $599 per product. (PSR ¶¶ 20, 54, 57, 62.) Based purely off of the anticipated MSRP for these products, a loss calculation of $250 per unit of prosecution is a reasonable estimate which fairly approximates the median price of these various software products. These items were eventually sold to the general public at price

12

points below the MSRP, and offset numerous sales that could have otherwise been captured by authorized retailers selling genuine, legitimate, versions of these products.

This loss estimate is conservative given that many of these items were resold many times, or supplied to multiple resellers or customers in the course of this investigation. For example, the forensic analysis of the codes used to activate these programs show that many of these codes were used to activate a given program multiple times over – in some cases, four or five times per code – on computers across the globe. Lastly, this $250 per unit of prosecution loss figure represents half of the proscribed loss amount in the Sentencing Guidelines for losses accrued from an access device. *See* U.S.S.G. § 2B1.1, Application Note 3(F)(i).

Each of the defendants has agreed to this per-unit loss calculation for the specific discreet illegal items identified in their respective plea agreements as being possessed or sold by that defendant. Moreover, the Government has consulted with the affected victim, Microsoft Corporation, and it approves of the use of this method of calculating loss for the purposes of the resolution of these criminal charges against these defendants.

## Calculation of Loss Attributable to Yang

Based on the Government's analysis detailed above as to the varying statutes given a potentially infringing item or contraband, the Government agrees with Yang that the appropriate loss attributable to him should be calculated based on the numbers of illicit COAs obtained from his residence and at Digisoft's headquarters at the time of the search on December 10, 2014. This calculation and determination was reached after extensive consultation with Yang's counsel, assessment of the evidence gathered at that point in the investigation, and consideration of the prevailing case law relating to software piracy prosecutions. The Government submits that the

13

approximate loss as reflected in the plea agreement, based off the 10,205 illicit COAs, of $2,551,250, is appropriate. The Government submitted its formal response to these objections on July 27, 2016. (*See* Attachment A - The United States Response to Defendant's Objections, dated July 27, 2016.)

## II.    GOVERNMENT'S VIEW OF 3553(A) FACTORS

### A.    Nature and Circumstances of the Offense and History and Characteristics of the Defendant (§ 3553(a)(1))

Rex Yang has been engaged in various computing and software enterprises since at least 2010 (PSR ¶ 95), although the investigation shows he has been involved with such sales since the mid-2000s. Beginning in or about 2010, he formed Friendly Earth, an electronics recycling company, with co-defendant Jake Schwartz and others (PSR ¶ 95.) Between 2012 through 2014, he co-owned Digisoft, LLC with Schwartz, as well as Premier Software and, later, Soft Deals, LLC (PSR ¶ 93).

### B.    Seriousness of Offense, Promote Respect for the Law, and Just Punishment, Afford Adequate Deterrence to Criminal Conduct, and Protect the Public from Further Crimes of the Defendant, and Provide Defendant with Needed Educational or Vocational Training (§ 3553(a)(2))

Yang conspired to engage in a scheme which introduced illicit software products into the United States marketplace. (PSR ¶¶ 12-14.) The technological advances developed by the citizens and corporations of the United States have greatly benefited the economy of our nation, and the need to protect this intellectual property has become vitally important in the twenty-first century. Microsoft, Adobe, and countless others developed computer programs at an accumulated cost of hundreds of millions of dollars, and these programs require constant upgrades and improvements to ensure that the companies' end users and customers can continue to use them as intended.

14

Software piracy greatly diminishes the financial incentive to develop these computer programs, and individuals or entities that introduce and sell these counterfeit, unauthorized, and illicit products in the United States marketplace also indirectly harm those other retailers that acquire and seek to distribute these computer programs in a legal and legitimate manner. Given the financial nature of these crimes, perhaps some of the deleterious impact upon the affected victim may be offset by an anticipated restitution judgment and the assets forfeited by Digisoft, LLC, Yang, and Schwartz.

Digisoft, LLC's illicit business practices have not gone unnoticed over time. Digisoft, LLC, was sued civilly by Adobe Systems Incorporated, in July 2014 in a lawsuit alleging copyright and trademark infringement. (PSR ¶ 50.) Accounts controlled or managed by Yang, including those with Digisoft, LLC, have received suspensions by various online marketplaces. (PSR ¶ 51.)

HSI special agents executed search and seizure warrants at Digisoft, LLC's place of business on December 10, 2014, recovering the approximately 4,387 illicit COAs which were not accompanying their intended copies of the computer software. (PSR ¶¶ 54.) Additional illicit COAs were also recovered from Yang's personal residence. (PSR ¶ 52.)

As noted, this investigation and prosecution has had an appreciable effect on the importation (whether physical or digital) of these counterfeit, unauthorized, and illicit software and software components and this investigation and its related prosecutions continues to act as a deterrent to much of the illegal and illicit software practices.

C.      Kinds of Sentences Available (§ 3553(a)(3) & (4))

Software piracy has been prosecuted in a number of different ways. To provide some relative context and history for the previous sentences issued in various other criminal prosecutions

15

in recent years, please see the below chart detailing the outcome of some of these other cases. This summary is not intended to be fully inclusive of every single software piracy prosecution, but rather those that the Government is aware of through legal research as well as secondary source information. While this summary contains a synopsis of previous cases, it is difficult (if not impossible) to distill the nuance of these individual cases to a fully quantifiable level. Many salient details of these cases – such as the criminal histories of the defendants, the egregiousness of the criminality, the findings of actual loss, or the actual number of infringing items – cannot be accurately reconstructed from a review of the publicly-available procedural history of these cases.

| Case Name / Date | Illicit COA Labels (§ 2318) | Counterfeit COAs, documentation and packaging (§ 2318, 2320) | Criminal Copyright Infringement (17 USC 506, 1201, *et seq.*) | Infringing Items[4] | Estimated Loss | Sentence |
|---|---|---|---|---|---|---|
| *U.S. v. Asif Khan*, Case No. 2:07-CR-00278-EFB (E.D. Ca. Apr. 8, 2008) | ✘ | Yes, but dismissed with plea | ✔ (misdemeanor) | 178 copies of counterfeit Microsoft Office 2003 | $30k-70k | Probation |
| *U.S. v. Jathan Desir*, Case No. 4:04-CR-00336-RP-PAW (S.D. Ia. Jan. 30, 2009) | ✘ | ✘ | ✔ | Distribution of over 13,000 copyrighted works to "warez" site | $120k-$200k[5] | Probation |
| *U.S. v. I-Che Lai*, Case No. 3:06-CR-00004-RNC-1 (D. Conn. Jun. 18, 2007) | ✘ | ✘ | ✔ | Distribution of over 13,000 copyrighted works to "warez" site | Unknown | Probation |
| *U.S. v. Nathan Carrera*, Case No. 3:09-CR-00102-AWT (D. Conn. Aug. 21, 2009) | ✘ | ✘ | ✔ | Distribution of over 13,000 copyrighted works to "warez" site | $70k-$200k[6] | Probation |

---

[4] These "Infringing Items" and "Estimated Loss" figures are drawn from various sources, including the factual statements in the filed plea agreements, publicly-accessible sentencing memorandum, and other matters discernable from the respective criminal dockets.

[5] Desir was convicted as part of "Operation Higher Education," a multinational software piracy investigation led by the FBI in the early 2000's. Desir and his codefendants acquired and shared cracked software programs and ripped DVDs and CDs via file-sharing programs. Desir's plea agreement contemplated this loss.

[6] Carrera was convicted as part of the "Operation Higher Education," investigation, and this loss range was stipulated by the parties in the plea agreement.

| Case | | | | | | |
|---|:---:|:---:|:---:|---|---|---|
| *U.S. v. Albert Bryndza*, Case No. 3:05-CR-00051-RNC (D. Conn. Sept. 11, 2007) | ✗ | ✗ | ✓ | Distribution of over 13,000 copyrighted works to "warez" site | $200k-$400k[7] | Probation |
| *U.S. v. Jeffrey Lerman*, Case No. 3:05-CR-00050-RNC (D. Conn. Aug. 8, 2007) | ✗ | ✗ | ✓ | Distribution of over 13,000 copyrighted works to "warez" site | $400k-$1M[8] | Probation |
| *U.S. v. Seth Kleinberg*, Case No. 3:05-CR-00049-RNC (D. Conn. Sept. 20, 2007) | ✗ | ✗ | ✓ | Distribution of over 13,000 copyrighted works to "warez" site | $1M-$2.5M[9] | Time served |
| *U.S. v. Cosburn Wedderburn*, Case No. 1:12-CR-00017-LPS (D. Del. Sept. 9, 2013)[10] | ✗ | ✗ | ✓ | Purchased "cracked" software from Xiang Li | $1M-$2.5M | Probation |
| *U.S. v. Timothy Mentzer and Joseph Huss, Jr.*, Case No. 2:05-CR-00002-01/02-PBT (E.D. Pa.) | ✗ | ✗ | ✓ | Distribution of over 13,000 copyrighted works through "warez" site | Unknown[11] | Probation |
| *U.S. v. Julius Liu*, Case No. 5:06-CR-00772-EJD (N.D. Ca. Mar. 20, 2014) | ✗ | Yes, but dismissed following appeal[12] | ✓ | Movies and counterfeit copies of Norton Anti-Virus | $400k-$1M | Probation |
| *U.S. v. Brian Rue*, Case No. 1:08-CR-00255-SS-2 (W.D. Tex. Dec. 23, 2008)[13] | ✗ | ✗ | ✓ | Pirated Adobe software offered via | $120k-$200k | One year, one day |

---

[7] Bryndza was convicted as part of the "Operation Higher Education," investigation, and this loss range was stipulated by the parties in the plea agreement.

[8] Lerman was convicted as part of the "Operation Higher Education," investigation, and this loss range was stipulated by the parties in the plea agreement.

[9] Kleinberg, an executive editor for gaming magazine, supplied (and in some cases, "cracked") pre-release copies of software titles to his codefendants. He was convicted as part of the "Operation Higher Education," investigation.

[10] Wedderburn was charged via information shortly before Xiang Li (see below), and it appears these matters are related.

[11] Mentzer and Huss were convicted as part of "Operation Fastlink," an investigation that overlapped with the aforementioned "Operation Higher Education."

[12] Liu's prosecution was the subject of an appeal before the Ninth Circuit Court of Appeals which held that the "willfully" component of 17 U.S.C. § 506(a) requires proof the defendant knew he was acting illegally, and that the "knowingly" trafficking counterfeit labels in violation of 18 U.S.C. § 2318(a)(1) require "knowledge that the labels were counterfeit." *See United States v. Liu*, 731 F.3d 982, 994 (9th Cir. 2013). While Liu was originally sentenced to 48 months imprisonment, following a remand from the 9th Circuit Liu was resentenced to time served on a new information and plea agreement to a criminal copyright infringement count.

[13] Rue and Partridge were convicted along with Rushing in the Western District of Texas

| Case | | | | Description | Loss | Sentence |
|------|---|---|---|-------------|------|----------|
| | | | | website | | |
| ***U.S. v. William Partridge***, Case No. 1:08-CR-00255-SS-3 (W.D. Tex. Dec. 23, 2008) | ✗ | ✗ | ✓ | Pirated Adobe software offered via website | $120k-$200k | One year, one day |
| ***U.S. v. Marvin Hudson***, Case No. 5:06-CR-00003-M (W.D. Okla. May 31, 2006) | ✗ | ✗ | ✓ (§ 371 charge) | 547 counterfeit Microsoft Office 2000 | $200k-$400k | One year, one day |
| ***U.S. v. David C. Russo***, Case No. 1:03-CR-00012-T-LDA (D. R.I. Apr. 23, 2004) | ✗ | ✗ | ✓ | Conspirator with operator of website that hosted cracked software and movies | $2.5M-$5M | 13 mos.[14] |
| ***U.S. v. Barry Erickson***, Case No. 1:02-CR-00089-CMH (E.D. Va. May 2, 2002) | ✗ | ✗ | ✓ | Conspirator with operator of website that hosted cracked software and movies | $2.5M-$5M | 15 mos.[15] |
| ***U.S. v. Joshua Abell***, Case No. 5:04-CR-00681-OLG (W.D. Tx. Sept. 7, 2006) | ✗ | ✗ | ✓ | Distribution of over 13,000 copyrighted works to "warez" site | $120k-$200k[16] | 15 mos. |
| ***U.S. v. William Martin***, Case No. 4:01-CR-00099-HDC (N.D. Okla. Jun. 3, 2002) | ✗ | ✓ | ✗ | 600 counterfeit Microsoft Office 2000 | $1.14M[17] | 15 mos. |
| ***U.S. v. Daniel Dove***, Case No. 2:07-CR-00015-JPJ (W.D Va. Jun. 26, 2008) | ✗ | ✗ | ✓ | Illegal torrents of movies, music, and software programs | $20M-$50M | 18 mos. |
| ***U.S. v. John Sankus, Jr.***, Case No. (E.D. Va. May 17, 2002) | ✗ | ✗ | ✓ | Leader/ operator of website that | $2.5M-$5M | 18 mos.[18] |

for their role in hosting websites offering cracked versions of Adobe software.

[14] Russo was charged, along with Erickson, Sankus, and Griffiths (see below), as part of "Operation Buccaneer," an investigation in the early 2000's that shut down an international network of individuals that made "cracked" versions of software and pirated movies and video games available through file sharing services and encrypted email transmissions.

[15] Erickson originally received a sentence of 33 months imprisonment on May 3, 2002, but a few months later his sentence was reduced to 15 months imprisonment following the filing of a Rule 35(B) motion by the government.

[16] Abell was convicted as part of "Operation Fastlink," an investigation that overlapped with the aforementioned "Operation Higher Education." The loss amount listed was stipulated in the plea agreement.

[17] The calculable loss amount was the subject of an unpublished decision in *United States v. Martin*, 64 Fed.Appx. 129, 2003 WL 1901280 (10th Cir. 2003).

[18] Sankus originally received a sentence of 46 months imprisonment, but following the filing of a Rule 35(B) motion by the Government a few months later, his sentence was reduced to 18 months imprisonment.

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | hosted cracked software and movies | | |
| **U.S. v. Rodolfo Cabrera and Henry Mantilla**, Case No. 2:09-CR-00173-HDM (D. Nev. Aug. 24, 2010) | ✗ | ✓ (§ 371 charge) | ✓ (§ 371 charge) | Counterfeit gaming kits | $100k-$200k | 24 mos. each |
| **U.S. v. Thomas Rushing**, Case No. 1:08-CR-00255-SS-1 (W.D. Tex. Dec. 23, 2008) | ✗ | ✗ | ✓ | Pirated Adobe software offered via website | $1M-$2.5M | 36 mos. |
| **U.S. v. Bruce Alan Edward**, Case No. 1:12-CR-20705-TLL (E.D. Mich. Jun. 9 2014) | ✗ | ✗ | ✓ [19] | Counterfeit copies of Microsoft Office 2003 | $1M-$2.5M | 36 mos. |
| **U.S. v. Ye Teng Wen and Hao He**, Case No. CR-05-00641-001-RMW; *U.S. v. Yaobin Zhai*, Case No. CR-05-00640-001-JW (N.D. Ca. Jun. 7, 2007) | ✗ | ✓ | ✓ | Mostly pirated CDs and DVDs; some software included | $6.9M | 37 mos. each |
| **U.S. v. Justin E. Harrison**, Case No. 06-CR-00311-ODE-AJB (N.D. Ga. Nov. 16, 2007)[20] | ✓ | ✗ | ✗ | 4,295 illicit COAs for Microsoft operating systems[21] | $200k or $1.2M; unknown | 46 mos. |
| **U.S. v. Jeremiah Mondello**, Case no. 6:08-CR-60016-AA (D. Or. Jul. 23, 2008) | ✗ | ✗ | ✓ | Burned CDs containing pirated Quicken programs | $400k-$1M | 48 mos.[22] |
| **U.S. v. Hew Raymond Griffiths**, Case No. 1:03-CR-00105-CMH (E.D. Va. Jun. 20, 2007) | ✗ | ✗ | ✓ | Australia-based operator of website which hosted cracked software and movies | Unknown | 51 mos. |

---

[19] Edwards was also convicted of mail fraud. He was also found not guilty on three of the six counts submitted to the jury.

[20] Atlanta Business Chronicle, *Georgia man gets prison time for selling unauthorized software* (Aug. 8, 2007), last accessed on Aug. 26, 2016, at http://www.bizjournals.com/atlanta/stories/2007/08/06/daily30.html.

[21] The appellate record in *United States v. Harrison*, suggests that Harrison acquired approximately 4,295 illicit COAs over the course of his business, and that, at sentencing, Harrison "admitted to one sale of approximately 1,950 COAs for over $200,000 in March 2005." *See* Brief for Appellee United States in *United States of America v. Justin E. Harrison*, 2008 WL 2857834, *4 (11th Cir. Feb. 19, 2008). This appeal did not appear to contest the loss calculation, but rather whether the "first sale" doctrine was a valid defense to a charge under 18 U.S.C. § 2318. The Eleventh Circuit ruled it was not.

[22] Mondello was also convicted of mail fraud and aggravated identity theft, which resulted in a 24-month consecutive sentence to his 24-month sentence for criminal copyright infringement and mail fraud.

19

| Case | | | | Description | Loss | Sentence |
|------|---|---|---|-------------|------|----------|
| *U.S. v. Andriy Susel*, Case No. 0:03-CR-00179-ADM (D. Minn. Feb. 11, 2005) | ✗ | ✗ | ✓ | Proprietary software of employer (software developer) | $400k-$1M | 51 mos.[23] |
| *U.S. v. Casey Lee Ross*, Case No. 15-00196-CR-DGK (W.D. Mo. Sept. 12, 2016) | ✓ | ✓ | ✗ | 30,159 unauthorized product key codes | $7.5M | Probation[24] |
| *U.S. v. Danny Ferrer*, Case No. 1:06-CR-00222-TSE (E.D. Va. Aug. 25, 2006) | ✗ | ✗ | ✓ | Hosted site allowing illegal downloads | $20M+ | 72 mos. |
| *U.S. v. Nathan Peterson*, Case No. 1:05-CR-00531-TSE (E.D. Va. Sept. 8, 2006) | ✗ | ✗ | ✓ | Hosted site allowing illegal downloads | $20M+ | 87 mos. |
| *U.S. v. Xiang Li*, Case No. 10-CR-112 (D. Del. Jun. 14, 2013) | ✗ | ✗ | ✓ [25] | Hosted site of "cracked" computer programs | $50M-$100M+ | 12 yrs |

Using the above chart as a guide, it would appears that the median sentence for software piracy convictions is approximately fifteen months imprisonment[26], and the average sentence is twenty-four months imprisonment.

A recommended sentence of approximately twelve months imprisonment is squarely between the median and averages of those sentences surveyed.

---

[23] Susel worked for a software manufacturer, and had stolen "copyrighted software from his workplace, sold the software on eBay, and delivered the software to purchasers through the United States." *See United States v. Susel*, 429 F.3d 782, 783 (8th Cir. 2005). Susel was also charged and convicted of mail fraud in addition to the copyright infringement charges. This 51 month sentence followed a weeklong trial in the Minnesota.

[24] The United States filed a separate motion pursuant to U.S.S.G. § 5K1.1 which detailed Ross's extensive substantial assistance in this investigation.

[25] Li was also convicted of conspiracy to commit wire fraud.

[26] *See U.S. v. William Martin*, Case No. 4:01-CR-00099-HDC (N.D. Okla. Jun. 3, 2002) (fifteen months imprisonment for approximately 600 counterfeit Microsoft Office 2000 programs, with an estimated loss of approximately $1.14M).

20

**D.      Need to Avoid Unwarranted Sentence Disparities (§ 3553(a)(6))**

Any consideration of an appropriate sentence should consider any unwarranted disparities among defendants with similar records. To date, codefendants Ross, Lockwood, and Davachi have been the only other defendants sentenced in this conspiracy, and each have received probation reflecting their cooperation. This recommended sentence is within the range of judgments in comparable software piracy convictions and reflects the seriousness of the offense for comparable offenders.

**E.      Need to Provide Restitution to Any Victims of the Offense (§ 3553(a)(7))**

The United States submits that the proper restitution award in this case will be $1,913,437.50 to Microsoft Corporation. As to Microsoft's loss, the calculation is complex. At first analysis, it might appear that a court could use the defendant's gross sales of the infringing products as a measure of the victim's corresponding loss. Just such a methodology was allowed in *United States v. Chay*, 281 F.3d 682 (7th Cir. 2002), although the Seventh Circuit noted that the "record was sparse" and it was only holding that the district court's restitution calculation was not an abuse of discretion, and the court was not "explor[ing] in a definitive way the various means by which loss might be calculated." *Id.* at 687 and n.2.

More recent cases have rejected the methodology of equating restitution with a defendant's gross sales. The leading case is *United States v. Fair*, 699 F.3d 508 (D.C. Cir. 2012). In *Fair*, the defendant plead guilty to copyright infringement and other charges arising from his sale of pirated Adobe products, and was ordered by the district court to pay restitution in the amount of his sales revenue. *Id.* at 509. The D.C. Circuit reversed the restitution award.

21

In reviewing cases, including *Chay* and later Seventh Circuit precedent, the D.C. Circuit determined that courts have consistently required that the restitution award be based on the victim's loss rather than the defendant's gain. *Id.* at 513-14. The *Fair* court instead articulated the proper test as the "lost-profits on diverted-sales theory," which requires the government to "offer sufficient evidence to establish both the profit margin per sale and the number of sales lost." *Id.* at 514. The court concluded, "the actual loss to the displaced (authentic) seller is the profit lost from the displaced sales – not the retail value of the goods that would have been sold . . . The gross proceeds that the defendant collects from the infringing sales are similarly an inappropriate gauge of the victim's lost profits." *Id.* (citations omitted). *See also United States v. Anderson*, 741 F.3d 938, 953-54 (9th Cir. 2013).

In this case, the United States submits that a proper application of the "lost-profits on diverted sales" theory results in a restitution order to Microsoft, in the amount of $1,913,437.50. Yang sold Microsoft-branded product to the public on his website, DigiSoft, that appeared to be, and were represented to be, genuine. There can be no question that Schwartz's customers intended to purchase genuine Microsoft products.

In addition, Yang agreed, as did pleading co-conspirators Davachi, Ross, Schwartz, and Lockwood, that a reasonable average retail value of each of the product codes was $250. This $250 average value represents the United States best estimate of the average retail value of the legitimate products sold by Microsoft or its retail partners. This value was reached after examining the retail prices corresponding to the illicit products sold by the pleading defendants, and after consultation with Microsoft and with the all of the defendants. In his declaration, Mr. Montgomery states that:

> I am further aware that Yang and the government have agreed that
> the Microsoft Product is reasonably valued at $250 per unit. I have

> consulted with other members of Microsoft's legal department and
> Worldwide Operations Anti-Piracy Services team and based upon
> these discussions, and our careful evaluation of the evidence
> involved in this case, Microsoft concurs that $250 per unit is a
> reasonable, albeit conservative, valuation for the Microsoft
> Product. Moreover, this valuation reasonably represents the
> revenue that Microsoft would have received from the genuine sales
> of the Microsoft Products that were displaced by Yang's illegal
> activities.

Montgomery Declaration at ¶ 6.

Consequently, had Microsoft sold legitimate products to these consumers, its gross revenue, conservatively, would have totaled $2,551,250. However, as *Fair* instructs, this is the beginning point of the analysis.

The next issue is whether Yang's sales actually displaced what would have otherwise been Microsoft's sales of legitimate products to these consumers. As noted, Yang sold his illegal product as though it was legitimate Microsoft product, which is a strong indication that his buyers were seeking legitimate Microsoft product to purchase.

In addition, the Court must determine Microsoft's profit margin on its sales to calculate Microsoft's actual lost profit. Mr. Montgomery has indicated that "I have researched Microsoft's profitability from publically reported information for the time period of the conspiracy, 2009 to 2014, and determined that Microsoft's average gross profitability for that time period was 75 percent." Montgomery Declaration at ¶ 7. From this figure, Mr. Montgomery states that, "Accordingly, Microsoft's actual loss from software sales displaced by Yang's distribution of Microsoft Product is $1,913,437.50. This loss figure is calculated using the following formula: 10,205 units of Microsoft Product x $250 (stipulated value per unit) = $2,551,250 x 75 percent (average gross profitability from 2009-2014) = $1,913,437.50" Montgomery Declaration at ¶ 7.

23

## SUMMATION

The Government recommends a sentence of approximately twelve months imprisonment. This recommendation was arrived at following a lengthy and extensive review of any and all applicable provisions of the statutes and the facts and circumstances of this case, Yang's role and relative conduct, and a consideration of the factors under 18 U.S.C. § 3553(a).

Respectfully submitted,

TIMOTHY A. GARRISON
United States Attorney

By      */s/ Patrick D. Daly*

PATRICK D. DALY
Assistant United States Attorney

JAMES C. BOHLING
Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East Ninth Street, Suite 5510
Kansas City, Missouri   64106
Telephone:   (816) 426-4249

*Attorneys for the United States*

24

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was delivered on the 13th day of April, 2018 to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record.

*/s/ Patrick D. Daly*

PATRICK D. DALY
Assistant United States Attorney

25